FILED

2006 Jan-10  PM 12:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ALABAMA**

**JASPER DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.** |
| | **6:05CV00380-VEH** |
| **JOHNNY CUPPS, individually and d/b/a CUPPS TRUCKING COMPANY a/k/a JOHNNY CUPPS AND COMPANY,** | |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

The defendant has moved to dismiss all three counts of the complaint the plaintiff filed on February 18, 2005.  Defendant Cupps alleges that the claims addressed in the instant complaint could have been litigated in a prior action between the same parties, *United States v. Cupps*, No. 00-1368-VEH, (formerly 00-P-1368-J), and therefore the litigation of those claims is now barred by the doctrine of res judicata, or claim preclusion.  For the reasons hereinafter stated, the motion is **DENIED**.

The court will begin its opinion with a discussion of the portions of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "Act") and its implementing regulations that are pertinent to this case, and then provide an overview of the relevant procedural history of the past and present litigation with Defendant Cupps.  The court will

then apply the doctrine of res judicata to the facts of this case.

## II.  Statutory and Regulatory Background

In 1977, Congress enacted SMCRA to "protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a).  SMCRA addresses surface mining-related problems retroactively in Title IV and prospectively in Title V.

### A.  Title IV

Title IV of SMCRA, 30 U.S.C. §§ 1231 – 1243,  was created to deal with

> the reclamation of mined areas left without adequate reclamation prior to the enactment of this Act and which continue, in their unreclaimed condition, to substantially degrade the quality of the environment, prevent or damage the beneficial use of land or water resources, or endanger the health or safety of the public.

30 U.S.C. § 1202(h).  Title IV of SMCRA contains the Abandoned Mine Land ("AML") fee provisions, and furnishes the mechanisms for using those AML fees to pay for the restoration of abandoned pre-SMCRA mines.

Congress determined that the burden for paying for the restoration of lands mined before the passage of SMCRA should be borne by the coal industry and, in turn, the consumers of coal.  H.R. REP. NO. 218, at 136 (1997), reprinted in 1977 U.S.C.C.A.N. 593, 668, as quoted in *Consolidation Coal Co. v. United States*, 64 Fed. Cl. 718 (Fed. Cl. 2005).  The Abandoned Mine Reclamation Fund holds the money needed to pay for restoring the various natural resources that were damaged by mining prior to 1977.  30 U.S.C. § 1231(a),

(c) and (d).  The excise taxes (i.e., the AML fees) imposed pursuant to Title IV of SMCRA are collected and deposited into the Abandoned Mine Reclamation Fund.  30 U.S.C. § 1232(a); 30 C.F.R. §  870.12(a).

All operators of surface coal mines are required each quarter to report their coal production to the Office of Surface Mining Reclamation and Enforcement ("OSM").[1]  30 U.S.C. § 1232(b); 30 C.F.R. § 870.15(a).  The reclamation fee is to be paid to OSM "on each ton of coal produced for sale, transfer, or use . . . ." 30 C.F.R. § 870.12(a).  The fee is "determined by the weight and value at the time of initial bona fide sale, transfer of ownership, or use by the operator." 30 C.F.R. §  870.12(b).  446 U.S. 754 Further, "the weight of each ton shall be determined by the actual gross weight of the coal." 30 C.F.R. § 870.12(b)(3).

To make sure that AML fees are appropriately reported and paid, all operators of coal mines are required to

> maintain, on a current basis, records that contain at least the following information:
>
> (1)     Tons of coal produced, bought, sold or transferred, amount received per ton, name of person to whom sold or transferred, and the date of each sale or transfer.
>
> (2)     Tons of coal used by the operator and date of consumption.

---

[1]   SMCRA established the OSM within the Department of the Interior, and gave the Secretary of the Interior, through the OSM, the authority to "publish and promulgate such rules and regulations as may be necessary to carry out the purposes and provisions of [SMCRA]," 30 U.S.C. 1211(c)(2).

(3)   Tons of coal stockpiled or inventoried which are not classified as sold for fee computation purposes under § 870.12.

30 C.F.R. §  870.16(a)(1) – (a)(3).  Furthermore, operators who claim exemption from the provisions of SMCRA under the 16⅔ exemption described in 30 U.S.C. § 1291(28)(A) are required to maintain sufficient production records to prove their continuing entitlement to that exemption.  30 C.F.R. § 702.15(a); *see also* Rules 880-X-2E-.02 and 880-X-2E.06 of the Alabama Surface Mining Commission.  An operator extracting coal under a 16⅔ exemption must also file an annual report with the regulatory authority.  30 C.F.R. § 702.18(a).  OSM employs a number of accountants, called "AML fee compliance auditors", who review the books and records of surface coal mining operations and determine whether the operator's quarterly production reports are accurate, and whether any claimed exemptions from SMCRA are valid.

Lawsuits for the collection of unpaid AML fees are authorized by 30 U.S.C. §§ 1232(e).  Count I of the instant complaint was filed pursuant to the authority granted in that portion of Title IV.

## B.   Title V

The portion of SMCRA that is directed toward "controlling coal mining's present and future environmental harms" is Title V (30 U.S.C. §§ 1251-79).  *United States v. Tri-No Enterprises, Inc.,* 819 F.2d 154, 157 (7th Cir. 1987) (noting "Title V imposes an obligation on operators of surface coal mining operations to control the environmental harm their operations may cause").  Congress defined "surface coal mining operations" very broadly to

encompass the many mining-related acts that harm society and the environment.  The term

"surface coal mining operations" means —

> (A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 516 [30 USCS § 1266] surface operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce.  Such activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the uses of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce at or near the mine site: Provided, however, That such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16 ⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale or coal explorations subject to section 512 of this Act [30 USCS § 1262]; and
>
> (B) the areas upon which such activities occur or where such activities disturb the natural land surface.  Such areas shall also include any adjacent land the use of which is incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities . . . .

30 U.S.C. § 1291(28).[2/]

To achieve its goals, Title V of SMCRA relies on "a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Virginia Surface Mining and Recl. Ass'n*, 452 U.S. 264, 289 (1981). OSM has authority to review proposed state regulatory programs to determine whether they "demonstrate[] that such state has the capability of carrying out the provisions of [SMCRA] and meeting its purposes * * * ." 30 U.S.C. § 1253(a). If so, the state obtains "primacy," or "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations * * * ." *Id*. Alabama is a primacy state. 30 C.F.R. § 901.10. Even in a primacy state, the Secretary of the Interior and OSM retain significant oversight and regulatory authority.

OSM has broad authority in primacy states to "make those investigations and inspections necessary to insure compliance with" SMCRA. 30 U.S.C. § 1211(c)(1). Under the provisions of Title V, OSM is required to take action when it has reason to believe that an operator is in violation of SMCRA. 30 U.S.C. § 1271(a)(1). In such a case, OSM usually must notify the state regulatory authority, and if the state regulatory authority fails within ten days to take appropriate action, OSM "shall immediately order Federal inspection" of the operation. *Id*. However, OSM need not notify the State prior to conducting an inspection

---

[2/]    Defendant Cupps claimed the 16 ⅔ exemption from SMCRA at the Dad's Hill Project and claimed the coal exploration exemption from SMCRA at the 282 Project. Both exemptions are derived from 30 U.S.C. § 1291(28)(A).

if there is " adequate proof that an imminent danger of significant environmental harm exists . . . ." *Id.*

If OSM determines on the basis of "any Federal inspection" that in fact the operator is in violation of SMCRA or a permit condition, and the violation "creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources," OSM must "immediately order a cessation of surface coal mining and reclamation operations."   The Secretary has determined that surface coal mining operations conducted without a valid mining permit constitute "a condition or practice which causes or can reasonably be expected to cause significant, imminent environmental harm to land, air or water resources."   30 C.F.R. § 843.11(a)(2).   Accordingly, when OSM determines that surface coal mining operations subject to regulation under SMCRA are being conducted without a permit, a federal cessation order is issued.   Once issued, a cessation order "remain[s] in effect until [OSM] determines that the condition, practice, or violation has been abated, . . . modified, vacated, or terminated. . . ."   30 U.S.C. § § 1271(a)(2).

If an operator "fails or refuses to comply with any order or decision issued by the Secretary under this Act", OSM may request injunctive relief from the federal courts. Count III of the instant complaint is based upon the alleged failure of the defendant to comply with an order of the Secretary of the Interior.

Title V provides for the assessment of civil penalties when OSM issues a notice of violation or cessation order.  SMCRA authorizes civil penalties of up to $5,000 per day for

each violation of the Act.  30 U.S.C. § 1268(a).  The Secretary has promulgated regulations that control the civil penalty assessment process.  Under those regulations, the Secretary assesses a $5000 per day fine only in extraordinary situations.  *See* 30 C.F.R. § 865.16. Establishing the fine for a federal notice of violation or cessation order issued for imminent harm requires that OSM give due consideration to such factors as the operator's history of previous violations, probability of occurrence, extent of potential or actual damage, negligence of the operator, and the good faith, if any, the violator showed in attempting to achieve compliance.  30 U.S.C. § 1268(a); 30 C.F.R. § 845.13.[3/]

The provisions of SMCRA at 30 U.S.C. § 1275 describe the process for administratively contesting both the existence of a violation (termed "the facts of a violation" in SMCRA and its implementing regulations) and the amount of the civil penalty assessment. Section 1275 anticipates that the violator will exhaust administrative review opportunities before contesting a violation or the amount of the civil penalty assessment in federal district court.  The federal regulations implementing SMCRA furnish the means to administratively contest both the facts of the violation (*see* 43 C.F.R. § 4.1160 *et seq.* and 30 C.F.R. §§ 843.14 – 843.20) and the amount of the civil penalty assessed for a violation (*see* 43 C.F.R. § 4.1150 *et seq.*, and 30 C.F.R. Part 865).  Once the Secretary's assessment of a civil penalty becomes final, the Secretary is authorized to bring a civil action to collect the penalties.  30 U.S.C. §

---

[3/]     The cessation orders issued to Defendant Cupps on February 23, 2000, were "imminent harm" cessation orders.  Accordingly, the civil penalty for those cessation orders was calculated using the formulas in 30 C.F.R. § 845.13. The civil penalty for the failure to abate cessation orders issued on April 6, 2000, was calculated at the rate of $825 per day, as required by 30 C.F.R. § 845.15(b)(2) (2000).

1268(d).  This statutory provision is the basis for Count II of the complaint filed on February 18, 2005.

### III.   Procedural History

The first complaint was filed by the plaintiff on May 22, 2000.  That complaint sought in Count I to compel Defendant Cupps, through a prohibitory injunction, to stop harassing federal employees and otherwise interfering with inspections of his operations.  In Count II, the plaintiff sought an order requiring Defendant Cupps to cease performing all surface coal mining operations until he obtained a permit or proved entitlement to an exemption from regulation under SMCRA.  Count III of the original complaint sought an injunction mandating the abatement of violations of SMCRA.

A Temporary Restraining Order was entered against Defendant Cupps on June 1, 2000, and, after a hearing that spanned two days, a Preliminary Injunction was entered on June 15, 2000.

Defendant Cupps appealed the Preliminary Injunction.  The Court of Appeals for the Eleventh Circuit affirmed the Preliminary Injunction in 2001.

Immediately after losing his appeal, Mr. Cupps started violating the Preliminary Injunction in a variety of ways.  Orders citing Defendant Cupps for contempt were entered on April 17 and April 19, 2001.  On May 15, 2001, Judge Inge P. Johnson entered a final judgment against Defendant Cupps as a sanction for his third contemptuous violation of the Preliminary Injunction.

-- 9 --

Plaintiff filed the instant three-count complaint on February 18, 2005.  Count I of the 2005 complaint seeks to recover a tax on the coal Mr. Cupps produced prior to January 1, 2000, at the Dad's Hill Project and the 282 Project.  Count II of that complaint seeks to recover unpaid civil penalties owed for violations of SMCRA at those two surface coal mining operations.  Count III asks the Court to compel Defendant Cupps to comply with a valid order of the Secretary of the Interior.  The defendant filed his Motion To Dismiss (doc. 7) on or about June 2, 2005.  On June 22, 2005 the plaintiff filed its Response (docs. 10 (replacing doc. 8) and 9).

Defendant Cupps is wrong about the applicability of the doctrine of claim preclusion.  It is not appropriate to bar any of the claims in plaintiff's second complaint because the defendant is wrong about a crucial fact: the claims covered by the February 2005 complaint were not, **and could not have been**, covered by the complaint filed in 2000.  Those claims did not exist at the time the initial complaint was filed.

### A.  Count III of the 2005 complaint came into existence more than three years after the initial complaint was filed on May 22, 2000.

The reason for disregarding Count III is obvious: that cause of action did not exist until July 13, 2003, when Defendant Cupps' time for appealing the ruling of Administrative Law Judge Lambrecht expired and that ruling became an order of the Secretary of the Interior enforceable under 30 U.S.C. § 1271(c).

If a cause of action didn't exist at the time the initial complaint was filed, the claim

preclusion doctrine cannot be used to bar that claim in a subsequent lawsuit. *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1298 (11th Cir. 2001) *cert. denied sub nom TDY Indus., Inc. v. Kaiser Aerospace & Elec. Corp.*, 534 U.S. 827 (2001). In its *Piper Aircraft* decision, the Court of Appeals for the Eleventh Circuit cited and quoted *Manning v. City of Auburn,* 953 F.2d 1355, (11th Cir. 1992) at 1360, for the proposition that "res judicata does ***not*** apply where the facts giving rise to the second case only 'arise after the original pleading is filed in the earlier litigation (emphasis in the original).'" *In re Piper Aircraft*, *supra* at 1298 (emphasis in the original).

Count III of the 2005 complaint did not exist until three years after the first complaint was filed in 2000. Therefore, the doctrine of claim preclusion cannot bar the plaintiff's present efforts to enforce that order of the Secretary of the Interior.

### B.  Counts I and II of the 2005 complaint did not exist when the initial complaint was filed.

### 1.  The claim for civil penalties did not exist on May 22, 2000 because the defendant still had opportunities for administrative review.

The mere belief on the part of the plaintiff that Defendant Cupps would owe civil penalties in some amount after he exhausted administrative review does not mean that the claim for penalties could have been filed on May 22, 2000. On May 22, 2000, plaintiff and defendant were still going through the process of setting the proper amounts of the civil penalties for Cessation Orders 2000-100-204-001, 2000-100-204-002, 2000-100-204-003 and 2000-100-204-004. Equally significant, the defendant had not yet exhausted his

opportunities to demonstrate that all four cessation orders were improperly issued.[4]

Where there is a process of administrative review such as the one provided by Congress in SMCRA, administrative remedies must usually be exhausted before judicial review is available. *See FTC v. Standard Oil of California*, 449 U.S. 813, 101 S.Ct. 62, 66 L.Ed.2d 16 (1980); *Myers v. Bethlehem Shipbuilding Co.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *and see Deltona Corporation v. Alexander*, 682 F.2d 888, 893 (11th Cir. 1982) (observing that exhaustion of administrative remedies is particularly important where a challenge to an agency's jurisdiction is raised "since the agency should ordinarily be given the first opportunity to consider a challenge to its jurisdiction").  The Court of Appeals for the Sixth Circuit examined the exhaustion requirement in the context of SMCRA and held:

> In the Surface Mining Act, Congress has provided a well-defined administrative system for resolution of enforcement actions stemming from cessation orders.  Given this machinery, we are reluctant to permit a district court to interrupt the Secretary's determinations.  Bypassing administrative remedies would impair the expeditious resolution of disputes and result in the forfeiture of administrative expertise.  [C]ircumventing the proscribed procedures could easily preclude the Secretary from building a factual record, from clarifying or narrowing the dispute, or from resolving the controversy altogether so as to obviate the necessity for judicial intervention.

*Shawnee Coal Co. v. Andrus*, 661 F.2d 1083 (6th Cir. 1981) at 1092.

---

[4]    As noted above, the regulations promulgated to implement 30 U.S.C. § 1268 are located at 30 C.F.R. Part 865.  The regulations establish a detailed process for determining the amount of a civil penalties for notices of violation and cessation orders.  The calculations **are not made** by the employee of OSM who issued the citation.  Those calculations are made by OSM specialists who are trained to set the amount of civil penalties for a specific violation, giving due consideration to the required criteria..

The relationship between the administrative review process for setting and contesting civil penalties and the time a claim for civil penalties accrues has been litigated in the context of 28 U.S.C. § 1268 (the federal provision that sets the statute of limitations for lawsuits to collect civil penalties under SMCRA).  In *United States v. McCune,* 763 F. Supp. 916 (E. D. Ohio, 1989) the Ohio district court determined that the United States would have no claim upon which it could file a lawsuit to collect civil penalties until the Secretary of the Interior determined, through the issuance of a final order, that a penalty was due.  The *McCune* decision is in accord with the weight of case law on the accrual of a claim for civil penalties under 28 U.S.C. § 1268.  *See, e.g., United States v. Meyers,* 808 F.2d 912 (1st Cir. 1987) (the limitations period is triggered on the date the civil penalty is administratively imposed); *United States v. McIntyre*,  779 F. Supp. 119 (S.D. Iowa 1991); *and see Crown Coat Front Co., v. United States*, 386 U.S. 503 (1967) (requiring the government to first obtain a civil penalty assessment through an administrative proceeding before instituting an enforcement proceeding).[5/]

---

[5/]    At first glance, *United States v. Lueking*, 125 B.R. 513 (E.D. Tenn. 1990) appears to be contrary to *United States v. McCune*, inapposite to *United States v. Meyers*, *United States v. McIntyre and  Crown Coat Front Co., v. United States*, and applicable to the defendant's arguments about the doctrine of res judicata. However, a close reading of *Lueking* shows that not to be the case.  As for its application of the doctrine of res judicata to the claim for civil penalties, *Lueking* is distinguishable on the facts.  That district court judge specifically noted that "[a]ll of the penalty assessments involved in the [Lueking] case **had already been made and in every instance the defendant had already waived his right** to challenge them before either of the prior actions for injunctive relief were filed."  *Lueking, supra*, emphasis added.  The facts here are thus inconsistent with the facts in *Lueking*.  As for its finding that the civil penalties accrued when OSM cited the underlying violations, the *Lueking* decision rests on an incorrect reading of SMCRA.  The *Lueking* decision is premised upon the finding that SMCRA contains no provisions mandating an administrative process for setting civil penalties.  The *Lueking* court was correct in the sense that SMCRA allows operators to waive their rights to administrative review of the civil penalty after the amount is calculated by OSM.  However, that court failed to

(continued...)

The availability of additional administrative review after entry of the Preliminary Injunction proves that the claim for civil penalties did not exist when the initial complaint was filed. Since the time for contesting the fact of the violations through the available administrative review process had not expired at the time the complaint was filed, it is simply impossible for the doctrine of claim preclusion does not apply to Count II of the 2005 complaint.[6]

### 2. The claim for AML fees also did not exist on May 22, 2000 because the defendant still had opportunities to prove he owed no fees.

Although counsel for the plaintiff admits he believed Defendant Cupps probably owed AML fees at the time the original complaint was filed on May 22, 2000, employees of the Office of Surface Mining Reclamation and Enforcement ("OSM") were still trying to determine the actual amount of AML fees owed, **if any**, by Defendant Cupps for the coal he

---

[5]   (...continued)
acknowledge the administrative process employed by OSM, as mandated in 30 C.F.R. Part 865, to actually assess the civil penalty. The determination in *Lueking* about the time a claim for civil penalties actually accrues does not appear to have been followed by any other court. On the other hand, the legal precedent on accrual of claims expressed in *United States v. McCune, United States v. Meyers*, *United States v. McIntyre, and  Crown Coat Front Co. v. United States* has been followed by numerous courts.

[6]   Additional proof that the claim for civil penalties had not accrued as a matter of fact and law on May 22, 2000, is contained in the 2005 complaint. The instant complaint, in paragraphs 19, 23, 26 and 31, sets out the dates the Secretary of the Interior issued her final orders for the underlying violations, and thereby established the amount of each civil penalty. The final orders for Cessation Orders 2000-100-204-001 and 2000-100-204-002 were issued on June 2, 2000. The final order for Cessation Order 2000-100-204-003 was not issued by the Secretary until August 24, 2000, and the final order for Cessation Order 2000-100-204-004 was issued on July 12, 2000. Obviously, all those dates are later than May 22, 2000, the date the original complaint was filed. The role of the final order in the civil penalty assessment process is explained in SMCRA at 30 U.S.C. § 1268(h). Under that statutory provision, an operator of a surface coal mine "*is not assessed* any penalty under § 518(h) (for failing to correct the violation) *until a final order is issued* by the Secretary *after the administrative review process is completed*." *Shawnee Coal Co. V. Andrus*, *supra*, emphasis added.

produced at the Dad's Hill Project.[7/]  More importantly for purposes of determining the applicability of the doctrine of claim preclusion, Defendant Cupps still had opportunities to demonstrate that no AML fees were owed.  If Defendant Cupps had complied with the Preliminary Injunction by submitting verifiable data that his Dad's Hill Project was, indeed, entitled to an exemption from the regulatory jurisdiction of the Secretary, he would not now owe AML fees on the coal produced at that site.  Furthermore, if Defendant Cupps had taken advantage of the administrative review procedures (discussed above) still available to him after the original complaint was filed and had been successful in proving that the cessation orders were improvidently issued by OSM, he would not owe any of the AML fees now sought in Count I of the 2005 complaint.  A claim for AML fees simply did not arise until after the defendant exhausted or waived his ability to contest the Secretary's regulatory jurisdiction over his mine sites.

        In summary, OSM had good and justifiable reasons for not suing for AML fees on May 22, 2000.  OSM's knowledge on that date about Defendant Cupps' coal production was based upon a limited amount of sales records, and sales records do not typically reveal the

---

        [7/]  On May 22, 2000, OSM was in possession of records obtained from some of the businesses that purchased coal from Defendant Cupps.  Testimony based upon those records was adduced by the plaintiff at the hearing on plaintiff's request for a preliminary injunction.  That testimony proved Defendant Cupps was subject to the regulatory jurisdiction of OSM and was obligated to comply with the provisions of SMCRA.  Plaintiff admits those records are useful in calculating the AML fees owed by Defendant Cupps.  However, AML fees are assessed on each "ton of coal produced by surface mining" according to SMCRA § 402(a), codified at 30 U.S.C. § 1232(a).  OSM's fee compliance auditors were still trying to acquire Defendant Cupps' production records so that the true amount of AML fees owed for all coal sales could be calculated.  OSM attempted to acquire Defendant Cupps' production records with an administrative subpoena prior to May 22, 2000, but that subpoena was ignored.  Subsequently, OSM asked for those production records (a) through its cessation orders for the Dad's Hill Project, (b) through a court order (the Preliminary Injunction, plaintiff's doc. 9, ***Exhibit 2***) and (c) through a request for production of documents during discovery.  Defendant Cupps did not produce his production records on any of those four opportunities.

weight of impurities that were removed prior to the time of the sale, an allowable deduction under 30 C.F.R. § 870.12(b)(3)(i).  OSM had not exhausted its avenues for obtaining Defendant Cupps business records on that date, and OSM obtained a provision in the Preliminary Injunction that obligated Defendant Cupps to provide verifiable production data long after the filing date.  Furthermore, if the defendant had pursued his administrative remedies and had demonstrated his entitlement to both of the SMCRA exemptions, he would owe no AML fees.  The claim for AML fees simply did not exist until the defendant exhausted or waived his administrative remedies.

### C.   The doctrine of issue preclusion is not available to the defendant for other reasons.

There are other reasons why the doctrine of claim preclusion should not be applied to any of the claims in the complaint filed on February 18, 2005.  The fourth requirement for application of that doctrine, as set out in *Davila v. Delta Airlines, Inc.*, is that "the prior and present causes of action are the same."  *Davila* provides scant guidance on what would make the causes of action covered by the 2000 complaint "the same" as any of the three causes of action addressed in the complaint filed on February 18, 2005.  "In determining whether the prior and present causes of action are the same," *Davila* says, " we must decide whether the actions arise 'out of the same nucleus of operative fact, or [are] based upon the same factual predicate.'"  *Davila*, supra, at 1187, quoting *In re Piper Aircraft Corp.*, *supra,* at 1297.

Defendant Cupps posits that "[b]oth lawsuits seek to redress alleged wrongs

committed by Defendant Cupps at the same . . . mine sites described in the complaint filed in this case."  Motion To Dismiss at 2.  Furthermore, Defendant Cupps believes "[j]urisdiction in that case, as well as in this case, [is] founded on the provisions of SMCRA and Title 28 of the United States Code."  Motion To Dismiss at 1.  Thus, to Defendant Cupps, it is obvious that the lawsuit filed in 2000 and the lawsuit filed in 2005 arise out of the same nucleus of operative fact, or are based upon the same factual predicate.

However, according to the Court of Appeals for the Eleventh Circuit, "the determination of whether the causes of action in two proceedings are the same is governed by whether the primary right and duty are the same."  *Manning v. City of Auburn, supra*, at 1358.  Using that standard, it is obvious that claim preclusion should not be used to bar any of the three counts in the 2005 complaint, because it is obvious that the "primary rights and duties" addressed in the two complaints are completely different.

All three counts of the first complaint sought injunctive relief, while only the third count of the instant complaint seeks any kind of injunctive relief.[8/]  The primary rights and duties that the plaintiff sought to enforce in the initial complaint were the defendant's duty to stop threatening and harassing OSM employees (Count I), the defendant's duty to stop conducting surface coal mining operations after receiving cessation orders from an authorized representative of the Secretary of the Interior (Count II), and the defendant's duty to abate any violation of SMCRA that the defendant failed to get vacated through the

---

[8/]    The plaintiff has already explained that res judicata cannot be used to bar Counts I,  II, or III of the instant complaint because they did not exist at the time the first complaint was filed.

available administrative review procedures (Count III).  Those duties are vastly different

from the duty to report and pay AML fees on all coal production (addressed in Count I of the

instant complaint), the duty to pay civil penalties, and the duty to cease harassing employees

of the defendant who assist OSM in investigating violations of SMCRA.

Moreover, the way the plaintiff's rights are vindicated are vastly different for each of

the two complaints.  As the defendant admitted in his Motion To Dismiss,

> A final judgment was entered in [the original case] on May 15,
> 2001, wherein Defendant Cupps was *found to be in contempt
> of court* [for the third time in the original proceeding] for
> violating certain previous orders of this Court entered pursuant
> to the allegations contained in the Complaint filed in the
> previous lawsuit.  That final judgment included not only
> contempt findings, but determined that Defendant Cupps was in
> violation of [SMCRA].

Motion To Dismiss at 1, emphasis added.  The defendant glosses over the fact that the

judgment that was entered on May 15, 2001 (plaintiff's doc. 9, ***Exhibit 4***), was entered as a

**sanction** for Defendant Cupps' contemptuous violations of the prohibitions set out in

Paragraph 5 of the Preliminary Injunction.  The final judgment makes clear that Defendant

Cupps was sanctioned for conducting additional surface coal mining operations at the 282

Project in March and April of 2001, and creating a new, unpermitted surface coal mining

operation in the vicinity of the Elvester Baptist Church in Blount County, Alabama, in 2001.

All of plaintiff's rights addressed in the first complaint and the Motion for Temporary

Restraining Order and for Preliminary Injunction and for Consolidation of Hearing with Trial

-- 18 --

(plaintiff's doc. 9, **_Exhibit 2_**) were vindicated (and could only be vindicated) through the district court's contempt powers.  In the second complaint, the plaintiff is seeking a money judgment for AML fees and civil penalties, and what amounts to a money judgment in favor of Mr. Marshal Bussey, a private beneficiary of the Secretary's order that enforces the anti-discrimination provisions of SMCRA at 30 U.S.C. § 1293 and the regulations at 30 C.F.R. Part 865.  Collection of any judgment entered against the defendant for the AML fees and civil penalties **will not depend** upon the Court's contempt powers.  In the second complaint, the only portion of the plaintiff's rights that depends upon this Court's contempt powers is the portion of Count III wherein the plaintiff seeks an order compelling the defendant to make restitution as required by the Secretary, distribute 30 C.F.R. Part 865 to his employees who have engaged in or carried out surface coal mining operations, and to refrain from similar acts of discrimination against any of his employees that might cooperate with OSM in the future.

## IV.  Conclusion

It is not appropriate to apply the doctrine of res judicata to the instant complaint because none of the claims actually existed at the time the first complaint was filed on May 22, 2000.  Additionally, the primary rights and duties addressed in the first complaint are of a significantly different character than the rights and duties in the second complaint.  Under the holding in *Manning v. City of Auburn, supra*, the prior and present causes of action are

not the same where the primary rights and duties in the two proceedings are not the same.

Accordingly, application of the doctrine of res judicata is not appropriate.

The Motion to Dismiss is **DENIED**.

**DONE** and **ORDERED** this 10th day of January, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge